UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| KAELIN MCCONNELL,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL RESERVE BANK OF MINNEAPOLIS,<br><br>Defendant. | Court File No. _____<br><br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## **INTRODUCTION**

1. Plaintiff Kaelin McConnell ("McConnell") was an employee in the IT Department of the Federal Reserve Bank of Minneapolis ("Defendant" or "Bank") for nearly four (4) years until January 21, 2022, when the Bank fired her because of her religious objection to the COVID-19 vaccine.

2. Several months after the COVID-19 vaccine became available to Americans, the Bank instituted a mandatory vaccination policy ("Policy"). McConnell applied for an exemption, and the Bank exempted her from that Policy. As part of the accommodation, she was required to wear a mask and maintain physical distance from other Bank employees, with which she complied dutifully. In November 2021, the Bank made the Policy more stringent on McConnell and forced her to segregate from vaccinated employees by not allowing her to eat at the cafeteria and forbidding her from using the on-site fitness facility.

1

3. Then, on December 16, 2021, the Bank suddenly reversed course and notified McConnell that it would no longer accommodate her religious beliefs because doing so would somehow create for it an "undue hardship." This is despite (a) her willingness to mask, test, and maintain distancing, (b) the Bank allowing employees to be unvaccinated for months while a vaccine was available, (c) McConnell's uncontroverted compliance with alternatives proposed earlier by the Bank which allowed her to continue safely working, and (d) scientific evidence available at the time that the COVID-19 vaccines protect the individual recipients but do not reduce the virus' transmission.

4. There was and is no undue hardship for the Bank to keep McConnell employed; rather, upon information and belief, the Bank accommodates other employees without any real difference between those employees and McConnell. In addition, during the entire time she was allowed to mask and distance, there were hundreds of construction workers working within the Bank's building daily.

5. To make matters worse, the Bank failed to make any effort, as part of the interactive process, to provide her opportunities to work different jobs at the Bank to accommodate her religious objection, even though she greatly desired to keep her job. The Bank made no effort to help her, despite its obligation to do so.

6. Because McConnell's sincerely held religious beliefs prevent her from becoming vaccinated with the COVID-19 vaccine, and because the Bank's vaccine mandate was not narrowly tailored to serve a compelling state interest, she is entitled to relief under Title VII of the Civil Rights Act and the Religious Freedom Restoration Act ("RFRA").

## THE PARTIES

7. Plaintiff Kaelin McConnell resides in Maple Grove, Minnesota, within the District of Minnesota.

8. Defendant Bank is one of twelve Federal Reserve Banks that make up the Federal Reserve System. Its offices are located at 90 Hennepin Avenue, Minneapolis, Minnesota 55401, within the District of Minnesota. The Bank is an instrumentality of the United States government, established by the Federal Reserve Act, 12 U.S.C. § 341 ("the FRA"). *See Fed. Res. Bank v. Metrocentre Improv. Dist. #1*, 657 F.2d 183, 185 n.2. (8th Cir. 1981). The Bank is an employer as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.

## JURISDICTION AND VENUE

9. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 42 U.S.C. §§ 2000e-(j) and 2000e-2 (Title VII), and 42 U.S.C. § 2000bb-1(c) ("RFRA"). McConnell alleges federal questions arising under the laws of the United States under Title VII and RFRA, the Bank is a covered entity under RFRA, and this Court has jurisdiction in civil actions against the United States, of which the Bank is a federal instrumentality under the RFRA.

10. This Court has authority to award the requested relief pursuant to Title VII of the Civil Rights Act and RFRA; and costs and attorneys' fees pursuant to Title VII and 42 U.S.C. § 1988(b).

11. This Court has both general and specific jurisdiction over the Bank, which is located within the District of Minnesota, and its acts alleged herein took place in the District of Minnesota.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2) and (e) and 42 U.S.C. §2000e-5(f)(3) because the Bank is an instrumentality of the United States doing business in the District and a substantial part of the events or omissions giving rise to McConnell's claims occurred in this judicial District.

## FACTUAL ALLEGATIONS

13. McConnell worked in the IT department at the Bank as a business analyst. She had been employed for nearly four years prior to her termination.

14. On or about March 11, 2020, at the onset of the COVID-19 pandemic in the United States, the Bank informed its workforce, including McConnell, that it was implementing a mandatory remote work policy until employees were otherwise notified.

15. McConnell worked entirely remotely until the summer of 2021 when she was called back to work at the Bank building a few days per week.

16. Beginning in March 2021, COVID-19 vaccinations became widely available to adults in the United States.

### McConnell's Sincerely Held Religious Beliefs

17. McConnell is a non-denominational Christian. She prays about everything she does and in turn relies upon God to guide her. She believes—as the Bible teaches—that she was made in the image of God and that her body is a "temple of the Holy Spirit." 1 Corinthians 3:16-17.

18. McConnell believes—based on religious teachings—she is obligated to adhere to her conscience because she will stand before God to give an account for all that she does. Romans 14:12. Part of this is her duty to steward her body in a manner that is glorifying to God; for her, this means that she must refrain from putting harmful substances into her body.

19. McConnell's beliefs also draw from the Book of Daniel. She draws a parallel between Daniel's situation in Babylon and her own. *See* Daniel 1. Daniel was under the authority of the King of Babylon and had different spiritual practices than the king's. The king required Daniel and others in the king's palace to eat the king's food and wine. Daniel asked the king's chief servant to be exempted from that policy, and asked for vegetables instead. The king's servant eventually granted Daniel's request. *See id.*

20. McConnell believes that she should follow this example of a person blessed by God as it relates to vaccination requirements: she should refrain and seek an exemption.

21. McConnell also believes God created her body and it functions sufficiently of its own accord, the way God intended, not requiring preventative medicines or treatments. As a corollary to this, McConnell believes that, under most circumstances, natural remedies should be pursued because they support and enhance the body's innate immune system.

22. McConnell practices her beliefs by forgoing preventative medicines that have deleterious effects on the body. This necessarily requires her to perform research to collect knowledge about the history, ingredients, uses, effects, and side effects of substances. McConnell then prayerfully considers the totality of the situation in light of her religious beliefs.

23. McConnell recognizes this to be a moral and religious obligation; therefore, it is through prayerful consideration—praying to God about what to do in a given situation—that these decisions are made. And McConnell believes God can communicate a response to her soul, either audibly or through a feeling.

24. It was through this religious practice that she processed and came to a decision that it would not be honoring to God to take the COVID vaccine. Specifically, McConnell prayerfully considered her state of health as a 27-year-old female, the effects of getting sick with COVID, the history of testing of the COVID vaccines, and the potential side effects of receiving a COVID vaccine.

25. She discerned that receiving a COVID vaccine would be harmful to the temple of God—her body—and would therefore violate her duty before God if she were to subject herself to it.

26. McConnell declined to receive a COVID-19 vaccination because of her religious conviction that she should not put harmful substances into her body.

27. Based on her knowledge of the COVID-19 vaccines and their potential harmful effects upon the body, to use any of these vaccines would violate McConnell's conscience and the Bible's command regarding stewardship of her body. A true and correct copy of McConnell's accommodation request describing some of her relevant religious beliefs is attached as **Exhibit 1 at McConnell 005.**

28. McConnell's religious objection to the COVID-19 vaccine is sincere, as the Bank admitted.

**The Bank's Policy and McConnell's Request for Accommodation**

29. In July 2021, the Bank informed its employees of its Policy requiring all employees to receive a COVID-19 vaccination or else submit a request for religious or medical accommodation, as applicable. Under the Policy, approved vaccines included Johnson & Johnson, Pfizer, and Moderna.

30. The Bank's Policy conflicted with McConnell's sincerely held religious beliefs because she could not in good conscience introduce any of these COVID-19 vaccines into her body.

31. McConnell spent a significant amount of time prayerfully considering her religious beliefs related to whether taking the COVID-19 vaccine would be pleasing to God. As she searched the scriptures for guidance, the Book of Daniel was particularly instructive to her, and she ultimately concluded that she could not take the vaccines.

32. On July 13, 2021, McConnell submitted a comprehensive Request for Accommodation to the Bank, explaining how its Policy was in direct conflict with her sincerely held religious beliefs.

33. In August 2021, the Bank informed McConnell that it would accommodate her exemption request, on a temporary basis.

34. As part of McConnell's accommodation, she was required to wear a Bank-issued mask and maintain a physical distance from other employees.

**The Bank Abruptly Reverses Course, Revokes McConnell's Accommodation, Fails to Engage in the Interactive Process, Fails to Accommodate McConnell, and Terminates Her Because of Her Religious Beliefs.**

35. At some point in 2021, the Bank decided that it would return most employees to the office for in-person work, beginning January 10, 2022.

36. On December 16, 2021, the Bank suddenly reversed course as to McConnell's accommodation and notified McConnell that it would no longer accommodate her religious beliefs because of a claimed "undue hardship." **Exhibit 1 at McConnell 003-004**.

37. The Bank told McConnell that she would have to receive her first vaccination dose no later than January 7, 2022, or she would be put on unpaid leave for two weeks and then terminated.

38. Accommodating McConnell would not have imposed, and does not impose, an undue hardship on the Bank.

39. Prior to the revocation of McConnell's accommodation, the Bank had allowed her to mask and distance for months with full compliance and no problems.

40. The Bank did not require any employee to be vaccinated for several months despite the availability of the vaccines to all Americans in March and April 2021.

41. Between the time the vaccines were approved for all Americans and the Bank decided to force McConnell to be vaccinated or be fired, there were hundreds of construction workers working in and out of the Bank's building daily. During this time, McConnell was doing in-person work at the Bank. Throughout that entire time, McConnell masked and maintained physical distance dutifully, with no problems.

8

42. As part of its reasoning for revoking McConnell's accommodation, the Bank claimed that, since employees were no longer going to be working remotely, the need to have close contact with a significant number of individuals would increase.

43. The Bank falsely claimed that it would be an undue hardship to allow McConnell to mask and maintain physical distance because she could not consistently maintain physical distancing while performing the essential functions of her role.

44. The Bank's claim that McConnell could not maintain adequate physical distancing while performing the essential functions of her role is false.

45. Upon information and belief, the Bank accommodates other employees who must be in close proximity to their fellow employees as part of a hybrid on-site and remote work arrangement.

46. McConnell worked in a cubicle at the Bank. As a business analyst in the IT Department, she would spend much of her day in the cubicle by herself; in fact, she was able to do her job entirely remotely. But even when she was on-site at the Bank, much of her work required her to work in the tech-shop, primarily alone.

47. The Bank refused to engage in any meaningful discussions with McConnell about any further accommodations or any other jobs with the Bank that would allow her to maintain her employment.

48. Before she was put on unpaid leave, on January 3, 2022, the Bank announced that the return to in-person work at the Bank would be delayed beyond January 10, 2022, eventually to approximately February 28, 2022 for McConnell's position.

49. McConnell asked that the Bank consider other positions or accommodations that would allow her to keep her employment with the Bank. The Bank refused this modest request.

50. Even though it delayed the in-person return of many employees to the end of February 2022, the Bank failed and refused to accommodate McConnell for additional time consistent with that delay.

51. On January 7, 2022, the Bank placed the McConnell on unpaid leave to be terminated on January 21, 2022. She was then terminated for her refusal to receive a COVID-19 vaccination. **Exhibit 1 at McConnell 001.**

52. Both prior to and subsequent to McConnell's termination, the Bank received many individuals into its building that it did not require to be vaccinated for COVID-19, or that it did not ensure were vaccinated, such as contractors and customers.

### The Defects of the Bank's Vaccination Mandate

53. At the time the Bank revoked McConnell's accommodation and forced its employees to get vaccinated or be fired, evidence was publicly available to the Bank that demonstrated that the COVID-19 vaccines available to Americans do not reduce transmission of the COVID-19 virus but instead only protect the individual recipients of the vaccine from serious infection. *E.g.,* Jennifer Frazer, "The Risk of Vaccinated COVID Transmission Is Not Low, *Scientific American*, Dec. 16, 2021, available at https://www.scientificamerican.com/article/the-risk-of-vaccinated-covid-transmission-is-not-low/ (last visited March 10, 2023); Carlos Franco-Paredes*,* "Transmissibility of SARS-CoV-2 among fully vaccinated individuals," *The Lancet*, Jan. 1, 2022, *available at*

https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00768-4/fulltext (last visited March 10, 2023).

54. Further, measures other than mandatory vaccination, such as temperature checks, mask-wearing, social distancing, regular testing, and quarantining of infected individuals are as effective, if not more effective, at controlling the spread of COVID-19 than mass-vaccinating the population, all of which McConnell was willing to do.

55. Given that the "safety risks" posed by McConnell have been the only interest identified by the Bank, and given that safety is advanced little or not at all by the vaccination mandate imposed by the Bank, the Bank's mandate lacks a rational basis, much less a compelling state interest, and is not narrowly tailored to advance any government interest.

56. The Bank's decision to deny McConnell an ongoing accommodation after initially granting her one cannot be justified under either the rational basis or compelling interest test.

57. Upon information and belief, despite the continual recurrence of COVID-19 cases, the Bank no longer maintains the COVID-19 vaccine policy.

## CAUSES OF ACTION

### Count One
### 42 U.S.C. § 2000bb et seq.

### Violation of the Religious Freedom Restoration Act (RFRA)

58. McConnell reincorporates the foregoing as if fully written herein.

59. The Bank is subject to RFRA because it is an "instrumentality" of the Federal government. 42 USC §2000bb-2(2).

60. RFRA states that the government shall not substantially burden a person's exercise of religion, even by means of a rule of general applicability. 42 U.S.C. § 2000bb-1(a).

61. RFRA protects any exercise of religion, whether or not compelled by, or central to, a system of religious belief. 42 U.S.C. § 2000cc-5(7)(A).

62. The exercise of religion involves not only belief and profession but also the performance of (or abstention from) physical acts for religious reasons.

63. McConnell sincerely believes that the exercise of her religion prevents her from submitting to injection with any of the available COVID-19 vaccines.

64. The Bank has not contested the sincerity of McConnell's beliefs that the exercise of her religion prevents her from receiving a COVID-19 vaccination.

### *Substantial Burden*

65. RFRA imposes strict scrutiny on all actions of the federal government (including the Bank as a federal "instrumentality") which substantially burden a person's exercise of religion. 42 U.S.C. § 2000bb-1(b).

66. A person's exercise of religion is substantially burdened whenever a measure imposes substantial pressure on an adherent to modify his or her behavior and to violate his or her beliefs.

67. A vaccination policy that terminates the employment of a person who refuses vaccination on account of his religious beliefs presents a substantial burden on that person's exercise of religion.

68. Because McConnell's religious beliefs prevented her receiving a COVID-19 vaccination, the Bank's Vaccine Policy imposed on McConnell the choice between violating her religious beliefs or else being terminated and losing her livelihood.

69. By pressuring McConnell to violate her religious beliefs in order to retain her employment, the Bank imposed a substantial burden on McConnell's exercise of religion.

### *Strict Scrutiny Analysis*

70. Under RFRA, the Bank's Vaccine Policy is subject to strict scrutiny because it imposes substantial burdens on McConnell's religious exercise. 42 U.S.C. § 2000bb-1(b).

71. Strict scrutiny requires that, before imposing a substantial burden on an individual's exercise of religion, the government must demonstrate that application of the burden to that particular individual (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means to achieving that interest.

### *the Bank Has No Compelling Interest*

72. Under RFRA, the Bank must establish that it has a compelling governmental interest in imposing a religious burden on McConnell.

73. The Bank must show a compelling governmental interest and prove that terminating McConnell's employment unless she consented to being vaccinated was the least restrictive means possible in achieving that alleged interest.

74. As demonstrated by McConnell's ability to perform the essential functions of her job for over 18 months while working remotely and practicing masking and social distancing without incident, as well as by the fact that the Bank initially granted a religious accommodation to her under circumstances not materially different than those when it

13

revoked that accommodation, the Bank does not have a compelling governmental interest in burdening McConnell's religious practice by mandating her vaccination. There is no rational basis, much less a compelling governmental interest, in terminating McConnell's employment for lack of COVID-19 vaccination.

75. The Bank ignored the fact that McConnell was doing her job throughout the pandemic both before she was granted an accommodation and after with no material difference in her job duties and with no problems.

76. During the time since COVID-19 vaccines became available, and during the months since McConnell had applied for a religious exemption, it had become clearly established that COVID-19 vaccinations did not achieve the only possible legitimate purpose of the mandate—to prevent transmission of the virus to other employees, contractors, or customers.

77. In addition, upon information and belief, the Bank no longer requires its employees to be vaccinated for COVID-19 as a condition of continued employment.

### *The Bank Did Not Use the Least Restrictive Means*

78. The least-restrictive-means standard is exceptionally demanding in that it requires the government to show that it lacks any adequate less restrictive means of achieving its desired goal. So long as the government can achieve its interests in a manner that does not burden religion, it must do so.

79. This standard requires the Bank to show that measures less restrictive of McConnell's religious exercise could not address its purported interest in reducing the spread of COVID-19.

80.     Requiring McConnell to be vaccinated against COVID-19 is not the least restrictive means the Bank could have employed to serve its alleged compelling interest.

81.     McConnell has been able to perform the essential functions of her job while adhering to the Bank's safety protocols that it deemed satisfactory for 18 months, and by working remotely during that time, without any adverse consequences.

82.     At the very least, the Bank has an obligation to demonstrate that requiring McConnell to be vaccinated is the least restrictive way of pursuing its interests. That requires demonstrating why other paths to the same goal are all inferior, which the Bank cannot do.

83.     Moreover, the Bank cannot establish that requiring McConnell to be vaccinated is the least restrictive means of pursuing a compelling interest compared to the means that have already been shown to be sufficient: i.e., allowing McConnell to work while wearing a mask and social distancing, or working remotely, as she had done for 18 months.

84.     Upon information and belief, the Bank has also accommodated some employees by allowing them to work a "hybrid" remote and in-person schedule, with no material differences between their work and McConnell's.

85.     The Bank violated RFRA and damaged McConnell by doing so, as alleged herein. The Bank's wrongful actions caused McConnell nominal, actual, and compensatory damages, and McConnell is also entitled to her costs, disbursements, and reasonable attorney fees. 42 U.S.C. § 1988.

## Count Two
## 42 U.S.C. §§ 2000e, et. seq.

### Title VII Religious Discrimination

86. McConnell reincorporates the foregoing as if fully written herein.

87. Title VII of the Civil Rights Act of 1964 prohibits the Bank from discriminating against its employees on the basis of their sincerely held religious beliefs. See 42 U.S.C. § 2000e-2(a).

88. As alleged herein, McConnell holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

89. McConnell informed the Bank of those beliefs and requested a religious exemption and reasonable accommodation from the Policy.

90. When the Bank revoked McConnell's accommodation by falsely declaring that the accommodation imposed an undue hardship on the Bank, the Bank also failed to initiate the interactive process regarding her accommodation request.

91. Despite McConnell's best efforts to initiate the interactive process, the Bank made no effort to meaningfully engage in that process or to accommodate her sincerely held religious beliefs.

92. Beside the interactive process, the Bank failed to provide McConnell with a reasonable accommodation, and instead terminated her employment, thereby discriminating against her because of her religious beliefs.

93. The Bank's failure to accommodate McConnell and provide her a religious exemption to the Vaccine Policy has harmed and will continue to harm her.

94. By failing to engage in the interactive process or offer any reasonable accommodation, and because, upon information and belief, the Bank accommodates others with objections to the Policy who are similarly situated to McConnell, the Bank's discriminatory actions were intentional and/or reckless and in violation of Title VII.

95. McConnell filed charges with the EEOC complaining of these discriminatory actions on September 6, 2022. **Exhibit 2 at McConnell 006**.

96. She was issued a right-to-sue letter on January 17, 2023. **Exhibit 3 at McConnell 007.**

97. By the acts, policies, and practices set forth in more detail above, the Bank has discriminated against McConnell in the terms and conditions of her employment on the basis of her religion, in violation of Title VII of the Civil Rights Act of 1964.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Kaelin McConnell respectfully requests that the Court enter judgment against the Bank and provide her with the following relief:

A. A declaratory judgment that the Bank violated McConnell's rights under RFRA;

B. A declaratory judgment that the Bank violated McConnell's rights under Title VII;

C. An award of nominal damages in favor of McConnell because of the Bank's violations of RFRA and Title VII;

C. An award of actual and compensatory damages in an amount to be proven at trial, including back pay, front pay, treble damages and statutory penalties, interest, emotional distress and pain and suffering, and any damages or penalties available at law;

D. Reinstatement to McConnell's former position at the Bank, with credit for years of work service during the time she was illegally terminated, and wage and benefit increases consistent with what an employee in her position would have received during her illegal termination;

E. An award of punitive damages because of the Bank's intentional discrimination against McConnell with malice and reckless indifference to her rights under RFRA and Title VII.

F. Reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988;

G. All and any further relief to which McConnell may be entitled; and

H. A trial by jury of all such matters properly tried as such is requested.

**UPPER MIDWEST LAW CENTER**

Dated: April 5, 2023

        */s/ James V. F. Dickey*
James V. F. Dickey (#393613)
Dustin T. Lujan (#0403962)
8421 Wayzata Blvd., Suite 300
Golden Valley, Minnesota 55426
James.Dickey@umlc.org
Dustin.Lujan@umlc.org
(612) 428-7000

*Attorneys for Plaintiff*